# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAUREN DONINGER, P.P.A. | : |
| As Guardian and Next Friend of | : |
| Avery Doninger, a minor, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     NO. 3:07CV1129 (MRK) |
| | : |
| KARISSA NIEHOFF and | : |
| PAULA SCHWARTZ, | : |
| | : |
| Defendants. | : |

## MEMORANDUM OF DECISION

Social networking websites and blogs (or web logs) have in recent years become an important part of the lives of young people, and many adults. But as some have come to discover to their chagrin, postings on such sites and blogs are often very public and the statements and information posted can have consequences for the blogger. Avery Doninger – a poised, intelligent, and articulate senior at Lewis S. Mills High School in Burlington, Connecticut – recently learned this lesson for herself. Frustrated at school officials over developments regarding a music festival she had been planning, Avery posted a public message to her fellow students on a social networking site. Just about everyone but Avery agrees that the manner in which Avery expressed her frustration was offensive and inappropriate. For the message used a vulgar, slang term to describe school officials, it contained at best misleading and at worse false information regarding the music festival, and it called on students and their parents to write the school superintendent in order to "piss her off more." When school officials – who had advised Avery before she made her blog posting about the proper way for student leaders to address issues of concern with the administration – discovered the message, they disqualified Avery from running for class secretary for her senior year. According to

school officials, Avery's conduct in posting the blog message failed to display the qualities of civility and citizenship that the school expected of class officers and leaders. That was Avery's only punishment; she was not suspended or removed from school, she did not receive any other written discipline in her permanent school file, and she continued as a member of student council and as a leader of her student music class.

Nevertheless, believing, as Avery put it, that the "punishment did not fit the crime," Avery's mother sued the school on behalf of Avery for numerous alleged violations of several provisions of the United States Constitution. They also sought a preliminary injunction asking the Court, among other things, to void the election for Senior Class Secretary, remove the student who had been duly elected class secretary, and require a new election in which Avery could run. Of course, whether disqualifying Avery from running for class secretary is a "fitting punishment" in the circumstances, or was overly harsh or even too lenient, is not for this Court to determine. That is for school officials to decide. As one court has properly noted:

> It may well be that a more relaxed or more self-assured administration would have let the incident pass without declaring [the student] ineligible [to run for class office], and perhaps that is what this administration ought to have done; it is not for us to say. Such a question, we believe, represents a judgment call best left to the locally elected school board, not to a distant, life-tenured judiciary.

*Poling v. Murphy*, 872 F.2d 757, 761 (6th Cir. 1989). Instead, the only question for this Court on Avery's motion for preliminary injunction is whether she has shown a substantial likelihood of succeeding on her claim that the school's actions violated her constitutional rights. On the record developed to date, Avery has not satisfied that burden. Therefore, the Court DENIES Plaintiff's Motion for a Preliminary Injunction [doc. # 9].

It is important to emphasize, however, that there are no villains in this case. Despite her momentary lapse of judgment, Avery is a good student and a good citizen at her high school. She is, as one witness put it, one of the "good kids." Nor are Ms. Niehoff and Ms. Schwartz tyrants bent on curbing the constitutional rights of all who criticize them. School teachers and officials have a difficult job. They must teach our children to think critically and to object to what they perceive as injustice. But school officials also must inculcate the values of civil discourse and respect for the dignity of every person. That is an especially difficult balance to achieve in a society where the public discourse to which students are exposed is often crude and even hurtful. In this case, the school administrators may – or may not – have struck the right balance. But the Court is convinced that the Constitution does not forbid their action. And in the end, that is all that this Court can, or should, say.

## I.

The following facts were developed from the exhibits and testimony presented during a hearing on the request for a preliminary injunction. The Court heard testimony from ten live witnesses and one who testified via deposition. They included students, faculty, administrators, and parents. Notably, Lauren Doninger, Avery's mother and the individual who filed this lawsuit on behalf of her daughter, chose not testify even though she attended every day of the hearing. The Court also received into evidence numerous exhibits, including numerous emails and the school handbook.

At the time of the relevant events (the 2006-2007 school year), Avery Doninger was a junior at Lewis S. Mills High School ("LMHS"). She was a representative on the Student Council and also served as the Junior Class Secretary, among other activities. In collaboration with other Student

Council members, Avery was largely responsible for coordinating preparations for Jamfest, an annual "battle of the bands" concert held at LMHS. The concert had traditionally been held in the school's auditorium, but was held in the cafeteria in the 2005-2006 school year due to the construction of a new auditorium. That building was finished in early 2007, and this case centers around the efforts of Student Council members, and particularly Avery, to secure the new auditorium as the location for the 2007 Jamfest.

After having previously been postponed twice because of delays in connection with the opening of the new auditorium, Jamfest was scheduled to take place on Saturday, April 28, 2007 in the new auditorium. However, before the students' spring break, which began on April 6, Avery learned that David Miller, the teacher responsible for working the high-tech light and sound systems in the new auditorium, was unable to be present on April 28. Although Avery and the other student coordinators proposed bringing in an outside professional or having a parent from the school supervise student technicians, they learned at a Student Council meeting on the morning of April 24, 2007 that Karissa Niehoff, the principal of LMHS, would not consider any solution that did not involve Mr. Miller. Although at the time, the students believed that this was a personal preference of Ms. Niehoff's, they later learned that Region # 10 Board of Education policy required Mr. Miller's presence at all such events in the auditorium.

The cafeteria was available as an alternative venue for Jamfest on April 28, but using the cafeteria would require the bands to play acoustic, rather than electric. This change would have necessitated alterations to the bands' sets, and the students feared that the bands would not have sufficient time to make the needed changes. Further, given prior postponements of Jamfest and the fact that the school year was drawing to a close, the students were concerned that a later date might

4

not be available, or that, even if a new date were found, some of the bands might refuse to play in the face of the additional rescheduling. In sum, the students were most anxious to ensure that Jamfest would not only be held on April 28, but also that it would be held in the auditorium on that date.

To that end, following the close of the meeting, Avery and three other students – all Student Council members – went with their faculty advisor, Jennifer Hill, to Ms. Niehoff's office in an attempt to find a time to discuss Jamfest. There, Ms. Niehoff's assistant informed them that Ms. Niehoff was in a meeting and was in fact busy for most of the day. At this point, the parties disagree on what occurred. Avery claims that Ms. Hill told them that the auditorium belonged to the taxpayers, as it had been paid for with the taxpayers' money, and so the students should send a mass email to the taxpayers explaining the students' plight and enlisting the taxpayers' support to hold Jamfest in the auditorium. Ms. Hill testified that she recommended that the students compose a list of reasons why Jamfest needed to be held in the auditorium, which they could present to Ms. Neihoff and Ms. Schwartz, and that they speak with their parents. However, Ms. Hill was adamant that at no point did she suggest or condone contacting taxpayers directly.

The other students presented testimony somewhere in between the versions of Ms. Hill and Avery. One student, P.A.,[1] testified that Ms. Hill suggested letting parents know about the scheduling issues, but that she did not specifically advise the students to send the email. J.E. testified that Ms. Hill knew the students were going to the computer lab, but she recalled only that Ms. Hill had recommended that the students write a list of reasons why Jamfest should be held in

---

[1] Given the fact that all of the student witnesses are minors, the Court will refer to them by their initials in an effort to protect their privacy.

the new auditorium. J.E. did not remember when the students came up with the idea of writing the mass email, or whether Ms. Hill was present at the time. T.F. testified that Ms. Hill told the students to 'get the word out,' which he interpreted to mean make phone calls. He understood Ms. Hill to be advising the four students to contact the members of the bands that were to play at Jamfest and ask them to have their parents call the school. T.F. specifically stated, "We said, 'Hey, let's take it even bigger than that.' That's where the idea of the E-mail came from – *ourselves, not Ms. Hill*." Deposition of T.F., Court Ex. 1, at 33 (emphasis added). Based on all of this testimony, the Court finds credible and adopts Ms. Hill's version of events, as supported by the testimony of the students other than Avery. Regardless, it is uncontested that at some point that morning, Avery, J.E., P.A., and T.F. decided to send an email to various taxpayers, informing them of the situation and requesting that they contact the school superintendent, Paula Schwartz, in the LMHS central office to demand that Jamfest be held in the auditorium on April 28.

The students obtained passes that permitted them to leave their first class and they met in the school computer lab. One of the students, P.A., and Ms. Niehoff testified that Ms. Niehoff was exiting the computer lab at approximately the time the students entered. However, the students did not attempt to speak with Ms. Niehoff, perhaps because she was with another teacher. While in the computer lab, the students accessed the email account of T.F.'s father, and sent an email to quite a number of local citizens. Most of the addresses came from T.F.'s father's address book, but Avery also suggested several names. T.F. composed the email, with the other three students providing various levels of input, and all four signed the final version. The students were all in agreement with the substance of the email, which stated that "[r]ecently the Central Office decided that the Student Council could not hold its annual Jamfest/battle of the bands in the auditorium." Defs.' Ex. A. The

students explained that Mr. Miller was unable to be present on the evening of April 28, 2007, and requested that the recipients contact the central office and "forward [the email] to as many people as you can." *Id.* The students' goal was for the taxpayers to convince the administration to permit Jamfest to be held in the auditorium on April 28, despite Mr. Miller's absence.[2] Ms. Doninger, among others, received the students' email and responded by contacting the school, urging Ms. Schwartz to permit the students to use the new auditorium for the concert on April 28. Pl.'s Ex. 6.

Avery went to Ms. Niehoff's office around midday on April 24, because she hoped to schedule a time after school when the four students and Ms. Hill could meet with the principal and discuss the students' concerns. Ms. Niehoff had been in the central office for a long-planned in-service training day, but she had been called away from her meetings by Ms. Schwartz as a result of the influx of calls and emails the latter received following the students' Jamfest email. Avery and Ms. Niehoff encountered each other in the hallway, and Ms. Niehoff told Avery that she wished to speak with her right away. Both parties agree that Ms. Niehoff was upset about the email the students had sent that morning. Avery claims that Ms. Niehoff told her that the central office had received numerous phone calls and emails, that Ms. Schwartz was very upset, and that as a result, Jamfest had been cancelled. Avery further alleges that Ms. Niehoff recommended changing the letter that the students had been drafting to Ms. Schwartz into a letter of apology, and that perhaps by doing so they might convince Ms. Schwartz to allow the students to hold Jamfest on another date later in the school year.

---

[2] An additional email was sent out later that morning, providing a corrected phone number for the central office. *See* Defs.' Ex. A. Although Avery was not present at the time, she stated at the hearing that she agreed with the substance of the message.

For her part, Ms. Niehoff testified that at the meeting, she told Avery that she was disappointed that the Student Council members had sent out an email to taxpayers, rather than coming to herself or Ms. Schwartz in order to resolve the issue, and that the email in fact contained incorrect information, in that Ms. Niehoff was open to rescheduling Jamfest to allow it to be held in the auditorium. Ms. Niehoff also said that she told Avery that using the school computer system to send a personal email violated the school's internet policy, and that in general, the students had failed to act in a manner appropriate to class officers. Finally, Ms. Niehoff told Avery that Ms. Schwartz deserved an apology and that the students should sent out a corrective email. Ms. Niehoff denies that she told Avery at any point that Jamfest was cancelled, and the Court finds that Jamfest was never definitively cancelled. In making this finding, the Court relies not only on Ms. Niehoff's testimony, but also on the testimony of the other Student Council members present on April 24. As the students' original Jamfest email made clear, the question was whether Jamfest could be held *in the new auditorium* on April 28, not whether it would be held at all.

In addition to Ms. Niehoff having to leave her in-service training on April 24, she and Ms. Schwartz were also forced to miss, or were late to, several other school-related activities they had scheduled for April 24 and 25. She and Ms. Schwartz both received numerous phone calls and emails from local citizens and parents, demanding a prompt response. Ms. Schwartz, for example, responded to Ms. Doninger's email on the evening of April 24, and sought to explain the rationale behind Ms. Niehoff's decision. As Ms. Schwartz wrote,

> This is the inaugural startup period for the new auditorium and very few groups are being given access until next school year[,] when all issues of supervision and control are in place. The technical supervisor is not available this weekend and Ms. Niehoff has offered the cafeteria as the second choice for this event. Ms. Niehoff has been very gracious to work with the students and I'm sure you can respect the need to

move cautiously as we bring this facility on-line.  The students, through their advisor, should be working to resolve this issue.  We have no intention of allowing unsupervised adults or students to use this equipment.  We've worked hard to get the use [of] the facility this spring, even though it needed to be limited.

Defs.' Ex. B.

Although Avery spoke with her mother by phone and in person on the evening of April 24 regarding Avery's disappointment due to the Jamfest situation, Avery did not meet or speak with the three other Student Council members involved with the Jamfest email or, evidently, learn of Ms. Schwartz's response to Ms. Doninger.  Instead, later that evening at approximately 9:30 p.m., Avery posted an entry to her livejournal.com blog regarding Jamfest.  Livejournal.com is an online community that allows its members to post their own blog entries and comment on the blog entries of others.  One need not be a registered member of the community to view the webpages, unless a blogger has adjusted her privacy settings to restrict access, in which case it is possible to view the blog only if the author has previously added the viewer to her "friends" list.  A privacy setting is also available that restricts access to the author alone.  *See* Pl.'s Ex. 3.  At the time Avery posted her blog entry, her privacy setting was "public," and Avery understood that this meant that anyone could view the webpage.  The content of the message itself suggests that her purpose was in fact to encourage her fellow students to read and respond to the blog, for she wrote:

> jamfest is cancelled due to douchebags in central office. . . . basically, because we sent [the original Jamfest email] out, Paula Schwartz is getting a TON of phone calls and emails and such. . . . however, she got pissed off and decided to just cancel the whole thing all together, anddd [sic] so basically we aren't going to have it at all, but in the slightest chance we do[,] it is going to be after the talent show on may 18th.

Defs.' Ex. C.  Avery attached the email that the students had sent out that morning, as well as the email her mother, Lauren Doninger, had sent to Ms. Schwartz and Ms. Niehoff, so that the blog

readers could "get an idea of what to write if you want to write something or call [Ms. Schwartz] *to piss her off more.*"  *Id.* (emphasis added).  Several LMHS students posted comments to the blog, including one in which the author referred to Ms. Schwartz as a "dirty whore."  Pl.'s Ex. 2.

The next morning, April 25, 2007, the four students and Ms. Hill met with Ms. Niehoff, Ms. Schwartz, Mr. Miller, and David Fortin, the building and grounds supervisor.  Although the administrators made clear that the auditorium was not available on April 28, they offered the students the option of either holding Jamfest in the cafeteria on that date, or holding the concert in the auditorium on a later date.  The students chose the latter, and Jamfest was rescheduled for June 8, 2007.[3]  Ms. Niehoff asked the students to send out a clarifying email to that effect, which they did; she also put a letter into the school newsletter laying out the resolution of the matter.  Pl.'s Ex. 7 (clarifying email); Defs.' Ex. M (Niehoff letter).  Ms. Niehoff also testified that she and Ms. Schwartz spoke to the students about the proper role of student officers in the resolution of such issues in future, and they made it clear that mass emails to the public were not acceptable.  Avery denies that this portion of the conversation, regarding the duties of student officers, occurred.  P.A. also has no recollection of the administrators telling the students that sending the original email was inappropriate.  T.F., however, testified that Ms. Schwartz "made sure she made her point that we shouldn't have done that," i.e., sent the email.  Dep. of T.F., Ct. Ex. 1, at 44.  J.E. also testified that Ms. Schwartz was hurt and upset by the email.  Having considered the testimony, the Court finds that Ms. Niehoff and Ms. Schwartz, at the very least, made clear to the students that appealing directly to the public was not an appropriate means of resolving complaints the students had regarding school administrators' decisions.

_____

[3]  Jamfest was successfully held on June 8, and all but one of the bands participated.

At the time the April 25 meeting was held, neither Ms. Schwartz nor Ms. Niehoff was aware of Avery's blog entry. However, even after their meeting with students on April 25, the two administrators continued to receive phone calls and emails regarding Jamfest, and it is unclear which of those communications, if any, resulted from Avery's blog. The issue did not arise again until Avery went to the principal's office on May 17, 2007 to accept her nomination for election as Senior Class Secretary. While she was there, Ms. Niehoff asked to speak with Avery and showed her a hard copy of the livejournal.com blog entry. Ms. Schwartz had forwarded a link to the blog to Ms. Niehoff on May 7, 2007. Knowing that Avery had AP exams scheduled in the near future, Ms. Niehoff had decided to wait to speak with Avery until after her exams, and in the meantime, Ms. Niehoff conducted research regarding LMHS policies and Connecticut education law. In the end, Ms. Niehoff decided to bar Avery from running for Class Secretary for her senior year.

At the May 17 meeting, Ms. Niehoff asked Avery to do three things: (1) apologize to Ms. Schwartz for the blog entry; (2) show the entry to Ms. Doninger; and (3) recuse herself from running for reelection. Avery agreed to the first two requests,[4] but refused to withdraw her candidacy for Senior Class Secretary. At that point, Ms. Niehoff told Avery that she, Ms. Niehoff, declined to provide the necessary administrative endorsement of Avery's nomination, meaning that Avery was effectively barred from participating in the upcoming class officer elections. Ms. Niehoff stated that her decision was based on Avery's failure to accept Ms. Niehoff's prior suggestions regarding the proper means of expressing disagreement with administration policy and seeking to resolve those disagreements, and also because the blog included vulgar language and inaccurate information.

---

[4] Avery wrote her apology to Ms. Schwartz on May 23, 2007, which began as follows: "Please accept my apology for the tone and language of the Live Journal entry that I posted on April 24th." Defs.' Ex. I..

Finally, the blog also encouraged citizens to contact the central office "to piss [Ms. Schwartz] off more," which Ms. Niehoff did not consider an appropriate action by a class officer. Avery was, however, permitted to retain her position as representative on the Student Council and was not asked to resign her position as Junior Class Secretary.[5]

After the May 17, 2005 meeting, Ms. Doninger began an effort to persuade Ms. Niehoff and Ms. Schwartz to reconsider Avery's punishment. Significantly, Ms. Doninger stated clearly in her first email to Ms. Niehoff, dated May 22, 2007, "Please do not understand me to be suggesting that Avery's Live Journal posting was acceptable – it was not. . . . *Avery's entry was offensive and she should be accountable*." Defs.' Ex. H (emphasis added). Ms. Doninger also reiterated, "[A]gain – [Avery's] posting was NOT appropriate – it was offensive and she needs to learn that she will not advance as a leader with that approach." *Id.* Ms. Doninger argued, however, that Avery's punishment was "an over reaching response with enormous consequences." *Id.* Instead, she urged as a more appropriate punishment that school officials preclude Avery from participating in Jamfest in 2007 and in 2008. *Id.* Ms. Doninger met with Ms. Niehoff on May 21, 2007, but Ms. Niehoff stood by her initial decision.

Elections for class and Student Council officers were held on May 25, 2007. A friend of Avery's made t-shirts that read "Team Avery" on the front and "Support LSM Freedom of Speech" on the back, and he gave "Team Avery" t-shirts to Avery and several other students. Avery herself

---

[5] Although Avery suggested in her pleadings that she was also required to step down as Junior Class Secretary for the remainder of the school year, she stated at the hearing that she was unclear on this point, and that Ms. Niehoff never specifically told her she was no longer acting Class Secretary. Ms. Niehoff testified that it was not her intention to remove Avery from her current position, but only to bar her from running for reelection. The Court thus finds that Avery was not removed from her position as Junior Class Secretary.

was wearing a t-shirt she had made with the message "R.I.P. Democracy." As several students wearing "Team Avery" t-shirts were walking into the auditorium, where candidacy speeches were to be given, Ms. Niehoff stopped the students and told them that they would need to remove their t-shirts before they could enter the auditorium. Avery, however, was permitted to wear her "R.I.P. Democracy" t-shirt into the auditorium. The shirts did not violate the dress code, but Ms. Niehoff testified that it was her intention not to permit electioneering materials of any kind into the auditorium for the election assembly. Ms. Niehoff believed that permitting electioneering materials into the election assembly might unfairly prejudice students who lacked such advertising resources. The students were, however, allowed to wear the "Team Avery" t-shirts in school both before and after the assembly, and they did so. During the assembly, a small number of students called out for Avery to speak, but no further disruption occurred. Avery's name was not on the printed class officer ballot, but she received a plurality of the votes by means of a write-in campaign. However, another student was elected secretary and she now serves as Senior Class Secretary.

At some point in early June, Ms. Doninger called the school and requested to see a copy of Avery's disciplinary file. The files are kept in the guidance office, and usually include only materials that are a permanent part of the student's record and available to colleges and certain other third parties. When Ms. Niehoff learned of Ms. Doninger's intention, she spoke with Ms. Schwartz and they agreed that it was appropriate to place a copy of Avery's activity log in her guidance file as well. The activity log includes entries for a variety of reasons, from suspensions or expulsions to unexcused absences from class to a report of trash in a student's parking space, and the events recorded are not necessarily the subject of any discipline. They are logs of interactions with students and they are electronically "rolled over" at the end of each school year, so that the information from

the prior school year is no longer available for general viewing.[6]  Avery's activity log included an

entry detailing her "inappropriate use" of school computers on April 24, 2007, in connection with

the mass email that was sent regarding Jamfest,[7] but there was no indication in the entry of any

discipline beyond the discussion Ms. Niehoff and Ms. Schwartz had with the students.  Ms. Niehoff

would usually access the activity log from her own computer and discuss it with the parent, but she

knew that she would be unavailable on the day that Ms. Doninger intended to visit.  Thus, Ms.

Niehoff stated that she had a copy of the activity log placed in Avery's guidance file so that Ms.

Doninger would be able to see all of Avery's school records in one location.

The activity log has since been removed from the guidance office file, as it was never

intended to be a part of Avery Doninger's permanent school record.   Regarding Avery's inability to

run for Senior Class Secretary, Ms. Niehoff wrote in an email to Ms. Doninger that "Avery received

a consequence because she posted the extremely disrespectful blog despite previous conversations

with her addressing the Jamfest event, the use of the auditorium, and appropriate conduct as a class

officer."  Pl.'s Ex. 15.  Ms. Niehoff specifically disclaimed that the email was the basis of any

disciplinary action.  The Court credits this testimony since the other students who participated in the

Jamfest email – none of whom sent emails or made blog entries like Avery's – were permitted to run

for positions as officers of their class or for Student Council.

Ms. Doninger and the two administrators, Ms. Niehoff and Ms. Schwartz, exchanged further

emails over the course of the next several weeks, and met on June 15, 2007.  Regrettably, the tone

_____

[6] Apparently, certain administrators have the capacity to bring up cumulative or historical log
entries on their computers, but Ms. Niehoff testified that she did not have such access.

[7] Ms. Niehoff testified that she also instructed similar entries to be placed in the logs of the
three other students responsible for the mass email on April 24.

of their communications degenerated. *See, e.g.*, Pl.'s Exs. 14; 15; 18; 19; 20; 22; 24. Predictably, therefore, a lawsuit followed. This action was filed in state court approximately one month later. Defendants then removed the case to federal court.

## II.

Ordinarily, to obtain a preliminary injunction, a plaintiff must establish the following: (1) irreparable harm; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in her favor. *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348-49 (2d Cir. 2003). In this case, however, Avery seeks an injunction requiring the school to remove the current Senior Class Secretary and to hold a new election for Senior Class Secretary in which Avery would be allowed to participate. Because this is a mandatory injunction that alters (rather than merely maintaining) the existing status quo, *see Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("A mandatory injunction . . . is said to alter the status quo by commanding some positive act."), an even higher legal standard applies. Avery must show a "clear" or "substantial" likelihood of success on the merits. *See Beal v. Stern*, 184 F.3d 117, 122-23 (2d Cir. 1999); *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) ("In some circumstances, an even higher standard applies. The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where . . . the injunction sought 'will alter, rather than maintain, the status quo'–i.e., is properly characterized as a 'mandatory' rather than 'prohibitory' injunction . . . ."). Since an injunction regarding the school administration's authority to ban partisan t-shirts and other electioneering materials would be necessary in the immediate future only if the Court ordered a new

election for Senior Class Secretary, the Court will apply the same clear or substantial likelihood of success on the merits standard to that claim as well.

The Second Circuit has also repeatedly emphasized that it considers "a showing of irreparable harm to be the most important prerequisite for the issuance of a preliminary injunction." *See, e.g.*, *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). Invoking the oft-quoted words of the Supreme Court in *Elrod v. Burns*, 427 U.S. 347 (1976), Avery asserts that any loss of First Amendment freedoms for even minimal periods of time "unquestionably constitutes irreparable injury." *Id*. at 373. Despite the rather capacious language of *Elrod*, however, courts have recognized that plaintiffs invoking the First Amendment do not always get a free pass on irreparable harm. As the Second Circuit has noted, "[w]e have not consistently presumed irreparable harm in cases involving allegations of abridgement of First Amendment rights." *Bronx Household of Faith*, 331 F.3d at 349. Unless a governmental directive limits protected speech directly, which is clearly not the case here, the Second Circuit has required that a First Amendment plaintiff seeking an injunction demonstrate that a challenged governmental action has had or likely will have an actual chilling effect on speech. *Id.*; *see also Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) (holding that a conjectural chill is not sufficient for demonstrating irreparable harm).

Avery claims that she was chilled from wearing her "Team Avery" t-shirt into the election assembly as a result of Ms. Niehoff's ordering other students to remove their "Team Avery" t-shirts.[8]

---

[8] Although Avery herself was not wearing a "Team Avery" t-shirt at the time, and was permitted to wear her "R.I.P. Democracy" t-shirt into the auditorium, she may still have standing to raise a First Amendment challenge regarding the "Team Avery" t-shirt she might otherwise have chosen to wear. As the Supreme Court stated in *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (internal citations omitted), "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable. This

Further, she asserts that she has limited her email and blog communications in an attempt to prevent another episode such as this one from occurring. For example, she has since limited access to her blog entries on livejournal, rather than leave the privacy setting for the site as public. Strictly speaking, existing case law does not seem to place any minimum on the First Amendment interest a party must assert to qualify for the irreparable harm presumption, *see Piscottano v. Murphy*, 317 F. Supp. 2d 97, 103 (D. Conn. 2004), and so for purposes of this preliminary injunction motion the Court will assume that Avery has established irreparable harm with regard to her First Amendment claims. The Court is less certain that being denied the opportunity to run for Senior Class Secretary – while obviously important to Avery herself – constitutes irreparable harm under the Equal Protection Clause of the Fourteenth Amendment. *See Piscottano*, 317 F. Supp. 2d at 104 (Plaintiffs "must establish the existence of irreparable harm on their non-First Amendment claims – namely, their Fourteenth Amendment Equal Protection claim . . . .").[9] However, the Court is willing to assume irreparable harm for the purposes of this opinion, especially in light of its determination that Avery has satisfied the requirement of showing irreparable harm for her First Amendment claim.

Having cleared the irreparable harm hurdle on her claims, the Court turns to the merits inquiry. Given the different analysis required for the various constitutional provisions, the Court will address each legal claim separately.

─────────────

exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Id.* at 129. For purposes of this decision, the Court assumes, without deciding, that Avery has standing to challenge the school's actions with regard to the "Team Avery" t-shirts.

[9] While Avery asserts in her complaint that Defendants violated her due process rights, her counsel at oral argument represented to the Court that she was not pursuing her due process claim on her motion for preliminary injunction.

### III. First Amendment Claims

Avery argues that her First Amendment rights were violated in the following ways: (1) when she was prevented from running for Senior Class Secretary; (2) when she was not permitted to wear a "Team Avery" t-shirt into the auditorium on May 25, 2007; and (3) when she was not permitted to give a speech at the May 25, 2007 assembly. Because Avery was not permitted to give a candidacy speech at the election assembly as a direct result of her exclusion from the ballot, the Court will consider the latter sanction to include the former for purposes of its analysis. After all, only students who were candidates for office were permitted to speak at this assembly. The Court also will not consider any First Amendment claims related to discipline for the original Jamfest email, given that the only alleged discipline, the activity log entry, has been removed from Avery's file.

The Supreme Court has made clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969). The Court has also cautioned, however, that "the constitutional rights of students are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). In the present case, this Court must determine whether LMHS administrators were entitled to decide that Avery's conduct in using the blog to address her concerns regarding Jamfest, as well as the language she chose to use in the blog itself, were sufficient to justify their declaring Avery ineligible to run for Senior Class Secretary, a voluntary extracurricular activity. This Court emphasizes that it need not – and does not – decide in this case whether and

when a school can suspend, discipline, or remove a student because of the content of a blog or email the student prepared off-campus. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975) (recognizing a student's "legitimate entitlement to public education" as protected under the Constitution).

## A.

The parties in their briefs argue strenuously about which line of First Amendment student speech cases should provide the proper framework for analyzing the school's actions in this case. Avery champions one of the most famous of student speech cases, *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969). In that case, several students decided to wear black armbands to school in order to protest the Vietnam War, despite a prohibitory school policy implemented two days earlier in an effort to forestall the students' protest. The Supreme Court "affirm[ed] the comprehensive authority of States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools," but also noted that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 507-08. Thus, the Court concluded that "conduct by the student, in class or out of it, which for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. However, other speech, especially passive political speech such as that reflected in the wearing of the black armbands, was protected. *Id.* at 511. As the Supreme Court held in *Tinker*, "Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.*

In response, the school Defendants ask the Court to focus instead on *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986). In *Fraser*, a student gave a speech on behalf of a nominee for student office that relied upon an extended sexual metaphor. Although the speech itself was not sexually explicit, the student later admitted that he "deliberately used sexual innuendo," and as a result, he was suspended for three days. *Id.* at 678. The Court noted the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of respondent's speech in this case," *id.* at 680, and warned that "[t]he undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681. The Supreme Court concluded that "[t]he First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission." *Id.* at 685.

Under *Fraser*, then, schools are generally held to have the authority to censor on-campus speech that school authorities consider to be vulgar, offensive, or otherwise contrary to the school's mission to "inculcate the habits and manners of civility," *id.* at 681, without the need to show a "substantial disruption" under *Tinker*. In *Morse v. Frederick*, 127 S. Ct. 2618, 2623 (2007), for example, the Supreme Court extended *Fraser* to cover on-campus speech that school administrators could reasonably interpret as advocating the use of drugs, a message "clearly disruptive of and inconsistent with the school's educational mission to educate students about the dangers of illegal drugs and to discourage their use." Thus, the Court upheld the suspension of a student who refused to take down a banner bearing the statement "Bong Hits 4 Jesus" at a school-sponsored event.

Two years after *Fraser*, in *Hazelwood v. Kuhlmeier*, 484 U.S. 260 (1988), the Court considered a set of circumstances in which a reasonable observer might conclude that a student's speech bears the imprimatur of the school, such as when the speech occurs in the context of a school newspaper, school play, or some other officially sanctioned event. In such a case, "[a] school must be able to set high standards for the student speech that is disseminated under its auspices – standards that may be higher than those demanded by some newspaper publishers or theatrical producers in the 'real' world – and may refuse to disseminate student speech that does not meet those standards." *Id.* at 271-72. In *Hazelwood*, for example, the Court held that the school principal was justified in forbidding the publication of several articles prepared for the school newspaper that he did not consider to be appropriate for various reasons. *Id.* at 273 ("[W]e hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."). Following this precedent, the Sixth Circuit in *Poling v. Murphy*, 872 F.2d at 758, for example, upheld the disqualification of a student from running for student council president on the basis of the "admittedly 'discourteous' and 'rude' remarks about his schoolmasters in the course of a speech delivered at a school-sponsored assembly."

It is apparent to the Court that *Hazelwood* does not apply to this case, as there was no risk that anyone would consider Avery's blog to be speech sanctioned by or otherwise attributable to the school. *See Morse*, 127 S. Ct. at 2627 ("*Kuhlmeier* does not control this case because no one would reasonably believe that Frederick's banner bore the school's imprimatur."). However, whether *Tinker* or *Fraser* provides the appropriate framework for considering the school's actions in this case is far less clear.

For neither *Tinker* nor *Fraser* involved participation in voluntary, extracurricular activities, and in other contexts, the Supreme Court and other courts have been willing to accord great discretion to school officials in deciding whether students are eligible to participate in extracurricular activities. Indeed, as one treatise has noted, "an overwhelming majority of both federal and state courts have held that participation in extracurricular activities . . . is a privilege, not a right. In fact, one of the longest string cites one is likely to encounter this side of a law review article supports the proposition that extracurricular activity is not a constitutionally protected property interest." Charles J. Russo & Ralph D. Mawdsley, *Education Law* § 4.05[1], at 4-20 to 4-21 (internal citations and quotation marks omitted); *see also Felton v. Fayette Sch. Dist.*, 875 F.2d 191 (8th Cir. 1989) (granting summary judgment for the school on the ground that the school's "good citizenship" rule furthered a legitimate pedagogical purpose and so was a permissible basis for a student's expulsion); *Farver v. Bd. of Educ. of Carroll County*, 40 F. Supp. 2d 323 (D. Md. 1999) (denying preliminary injunction against students' suspension from extracurricular activities as a result of violations of the school's policy prohibiting actual or constructive possession of alcohol); *D.N. v. Penn Harris Madison Sch. Corp.*, No. 3:05-CV-716RM, 2007 WL 2710596 (N.D. Ind. Sept. 18, 2006) (dismissing for failure to state a claim a suit brought by a student challenging his suspension from participation in extracurricular activities following a violation of the school's code of conduct). Thus, in *Vernonia School District 47J v. Acton*, 515 U.S. 646 (1995), a Fourth Amendment case involving student athletes, the Supreme Court noted that "[b]y choosing to 'go out for the team,' they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally. . . . Somewhat like adults who choose to participate in a 'closely regulated industry,'

students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy." *Id.* at 657.

As a student leader, Avery had a particular responsibility under the school handbook and school policy to demonstrate qualities of good citizenship at all times. Ms. Niehoff testified that she defined good citizenship as respect for others, behaving appropriately and as a good role model, working to initiate community connections, and promoting positive interactions and conflict resolution. Avery and Ms. Doninger also signed the school handbook, which included language regarding the social and civic expectations of students, at the beginning of the school year. Ms. Niehoff testified as well that class officers were expected to work toward the objectives of the Student Council, work cooperatively with their advisor and with the administration, and promote good citizenship both in school and out. Not least, the Court finds that Ms. Niehoff discussed these responsibilities with Avery on April 24, 2007, in the context of the original Jamfest email, and indicated to Avery that such an approach to conflict resolution with the administration was inappropriate. Understandably, then, Ms. Niehoff testified that a factor of particular relevance in her disciplinary decision was the fact that Avery posted her blog entry the very evening of the day on which that conversation occurred.

The blog itself clearly violates the school policy of civility and cooperative conflict resolution. Apart from the use of the word "douchebags," Avery also urged her readers to contact Ms. Schwartz specifically to "piss her off more," Defs.' Ex. C., hardly the type of constructive approach that a school would wish to encourage. Avery also strongly suggested in her email that Jamfest had been cancelled, full stop, despite the fact that Ms. Niehoff, even according to Avery's own testimony, offered the possibility of rescheduling Jamfest later in the school year. Thus, this

statement was at best misleading, and at worst, entirely false. As Ms. Niehoff noted in her testimony, Avery's conduct in writing the blog was exacerbated by her inclusion verbatim of the email the four students had sent earlier in the day and which Ms. Niehoff had told Avery was in violation of the school's internet policy. The three other signatories to the email, P.A., J.E., and T.F., all stated that they considered the use of the word "douchebags" to be inappropriate, and Ms. Doninger also agreed that the blog was offensive and deserving of punishment. *See* Dep. of T.F., Ct. Ex. 1, at 93-94; Defs.' Ex. H (Ms. Doninger). Indeed, Avery's counsel conceded at oral argument that the blog entry was offensive. Even Avery herself intimated that she opposed the specific punishment chosen rather than denying the appropriateness of any punishment at all, stating that this was a case where "the punishment didn't fit the crime."

Perhaps a more "fitting" punishment, as suggested by Ms. Doninger, would have been to bar Avery from participation in either this year's or next year's Jamfest. *See* Pl.'s Ex. 11. However, as the Court has already discussed, it is not the Court's role to determine whether the discipline imposed was the most appropriate, but only whether that discipline was constitutionally acceptable. Once school authorities made the permissible decision to punish Avery for her blog entry, the scope of that punishment lay within their discretion. The Court defers to their experience and judgment, and has no wish to insert itself into the intricacies of the school administrators' decision-making process.

None of this is to say that school officials have completely unfettered discretion to disqualify students from participating in extracurricular activities. This Court is not faced with a case where a student was denied the right to run for student office because of the color of her skin, or her religion, or even her politics. Nor was Avery barred from running simply because she disagreed with school administrators and that is made clear by the fact that the other three students who sent the

mass Jamfest email were permitted to run for student office. Instead, Avery was barred from running as a class officer because of her conduct and the vulgar language she used in her blog, neither of which were consistent with her desired role as a class leader. There can be no question that teaching students the values of civility and respect for the dignity of others is a legitimate school objective. *See, e.g.*, *Morse*, 127 S. Ct. at 2626; *Fraser*, 478 U.S. at 683. The Supreme Court put it as follows in *Fraser*:

> The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers – and indeed older students – demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct . . .

*Fraser*, 478 U.S. at 683.

As the Sixth Circuit aptly stated in *Lowery v. Euverard*, – F.3d –, 2007 WL 2213215 (6th Cir. 2007), a case in which students on a football team contested their exclusion from the team based on their writing a petition seeking the coach's removal, "Plaintiffs' regular education has not been impeded, and, significantly, *they are free to continue their campaign to have Euverard fired*. What they are *not* free to do is continue to play football for him while actively working to undermine his authority." *Id.* at *16. Similarly in this case, Avery is free to express her opinions about the school administration and their decisions in any manner she wishes, and Ms. Niehoff and Ms. Schwartz expressly deny that any discipline or loss of school time might result from the expression of those opinions. However, Avery does not have a First Amendment right to run for a voluntary

extracurricular position as a student leader while engaging in uncivil and offensive communications regarding school administrators.

**B.**

If the Court is wrong about that and it must instead choose between the analysis provided by *Tinker* or *Fraser* in assessing the school's actions in disqualifying Avery from running for Senior Class Secretary, the Court believes (at least at this preliminary stage) that this case is closer to *Fraser* than to *Tinker*, though the Court admits that this calculus is less than entirely clear and that this case is neither just like *Fraser* nor *Tinker*. To be sure, the speech involved here, unlike in *Fraser*, was created off-campus. But it was purposely designed by Avery to come onto the campus.

Recently, in *Wisniewski v. Board of Education of the Weedsport Central School District*, – F.3d –, 2007 WL 1932264 (2d Cir. 2007),[10] the Second Circuit upheld a school's suspension of one of its students for using an instant messenger ("IM") icon that suggested a named teacher at the school should be shot and killed. Although the student created the icon on his home computer, the court stated that "[t]he fact that Aaron's creation and transmission of the IM icon occurred away from school property does not necessarily insulate him from school discipline." *Id.* at *5. The student shared his IM icon with 15 of his friends, including fellow classmates, over the course of three weeks. As a result, the court held that "it was reasonably foreseeable that the IM icon would come to the attention of school authorities and the teacher whom the icon depicted being shot . . . [a]nd there can be no doubt that the icon, once made known to the teacher and other school officials,

_____

[10] Although Avery points to *Thomas v. Board of Education, Granville Central School District*, 607 F.2d 1043 (2d Cir. 1979), for the proposition that off-campus student speech should receive the full panoply of First Amendment protections, despite any later effect on the student body, the Court finds the later Second Circuit precedent of *Wisniewski* is the more appropriate precedent in analyzing the facts of this case.

would foreseeably create a risk of substantial disruption within the school environment." *Id.*[11] Therefore, the Second Circuit held that in disciplining the student, the school committed no violation of his First Amendment rights under *Tinker*. *See Layshock v. Hermitage Sch. Dist.*, – F. Supp. 2d –, 2007 WL 2022096 (W.D. Pa. 2007) (applying *Tinker* to a student's offensive mock MySpace profile of the principal for which the student was suspended); *Mahaffey v. Aldrich*, 236 F. Supp. 2d 779 (E.D. Mich. 2002) (applying *Tinker* to a student website created off-campus and containing objectionable material for which the student was suspended); *Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446 (W.D. Pa. 2001) (applying *Tinker* to a student's vulgar "Top Ten" list created off-campus and insulting a school coach for which the student was suspended); *Beussink v. Woodland R-IV Sch. Dist.*, 30 F. Supp. 2d 1175, 1177 (E.D. Mo. 1998) (applying *Tinker* to a student's homepage with "criticism of the high school includ[ing] crude and vulgar language" for which the student was suspended). As Judge Jon O. Newman noted long ago in an oft-cited concurrence, "School authorities ought to be accorded some latitude to regulate student activity that affects matter of legitimate concern to the school community, and territoriality is not necessarily a useful concept in determining the limit of their authority." *Thomas*, 607 F.2d at 1058 n.13 (Newman, J., concurring).

---

[11] At oral argument, Avery's counsel suggested that the holding in *Wisniewski* should be limited to the *Tinker* framework; that is, that off-campus speech directly affecting the school in a reasonably foreseeable manner could only be analyzed under the *Tinker* rubric for on-campus speech. The Court, however, does not read *Wisniewski* to be so limited, and in fact sees no reason to deny the application of *Fraser* to off-campus speech that affects the school in a reasonably foreseeable manner and that would otherwise be analyzed under *Fraser* had it actually occurred on-campus.

Although the panel in *Wisniewski* was divided as to whether it was necessary to show that it was reasonably foreseeable that the IM icon would reach campus, the judges in *Wisniewski* were unanimous that substantial disruption on campus as a result of the icon was itself reasonably foreseeable. 2007 WL 1932264, at *5.

Under *Wisniewski*, therefore, the Court believes that Avery's blog entry may be considered on-campus speech for the purposes of the First Amendment. Most importantly, the content of the blog was related to school issues, and it was reasonably foreseeable that other LMHS students would view the blog and that school administrators would become aware of it. Even apart from the fact that other LMHS students *did* post comments to Avery's livejournal.com blog in response to the entry in question and Ms. Schwartz and Ms. Niehoff *did* discover the entry, the content of the blog itself indicated that Avery knew other LMHS community members were likely to read it. After all, she chose the blog as a means of communicating her displeasure with the administration's decisions and encouraging others to contact school officials with their own opinions, a choice that would have been senseless if no other students were likely to receive her message.

*Fraser* and *Morse* teach that school officials could permissibly punish Avery in the way that they did for her offensive speech in the blog, which interfered with the school's "highly appropriate function . . . to prohibit the use of vulgar and offensive terms in public discourse," *Fraser*, 478 U.S. at 683, and to encourage the values of civility and cooperation within the school community, by removing her from the ballot for Senior Class Secretary. However, *Morse* rightly emphasized that it would "stretch[] *Fraser* too far . . . to read [that case] to encompass any speech that could fit under some definition of 'offensive.'" *Morse*, 127 S. Ct. at 2629 ("[A]fter all, much political and religious speech might be perceived as offensive to some."). As a consequence, this Court would be reluctant to find no First Amendment violation in other factual contexts or if the discipline imposed on Avery were different.[12]    However, the circumstances outlined above convince the Court that given the

_____

[12] For example, in *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320 (2d Cir. 2006), the Second Circuit applied *Tinker*, rather than *Fraser*, to the decision by school officials to prohibit a student from wearing a t-shirt to school bearing images of drugs and alcohol. Although the school argued

precise facts of this case, Avery has not demonstrated that she has a substantial likelihood of success in challenging the constitutional validity of Ms. Niehoff's and Ms. Schwartz's actions in barring her from running for Senior Class Secretary.

## C.

The Court has more substantial concerns, however, regarding the "Team Avery" t-shirts. The shirts did not violate the school dress code or contain vulgar or offensive language, and could not be seen as endorsed by the school administration. Moreover, the students intended to wear them in the auditorium as a silent protest, similar to the wearing of black arm bands in *Tinker*. As such, the t-shirts are not governed by either *Fraser* or *Kuhlmeier*, but rather by *Tinker*. As mentioned above, under *Tinker*, the school administration must show that permitting the t-shirts into the auditorium "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509 (quotation marks omitted). No such showing was made at the preliminary injunction hearing; the only evidence of a disruption at the election assembly was the shouting of one or perhaps a few students that Avery be allowed to speak. Not only was the disruption minor and temporary, it could hardly be due to the t-shirts, as the students were forbidden to wear them into the auditorium. Ms. Niehoff and Ms. Schwartz have presented no evidence that had the t-shirts been permitted, the foreseeable disruption would have been so much greater as to meet the *Tinker* standard.

---

that the images were offensive and in contravention of the school's policy against drugs, the Second Circuit held that in the context of the overall anti-Bush message of the shirt, the images constituted political speech more appropriately analyzed under the *Tinker* framework. For the reasons discussed above, the Court believes the facts of the current case to be distinguishable from those of *Guiles* in several material respects. Also, *Guiles* expressly relied on the Ninth Circuit's decision in *Morse*, *see, e.g.*, 461 F.3d at 328-29, which the Supreme Court has since reversed. Of course, unless and until the Second Circuit says otherwise, the Court will assume *Guiles* remains good law.

However, the Court would also note that *Tinker* applies to the "prohibition of a *particular expression of opinion*." *Id.* (emphasis added). School administrators are certainly free to set reasonable, *ex ante* policies regarding the forms of expression considered appropriate in light of the school's educational mission. *See, e.g.*, *Morse*, 127 S. Ct. at 2622 (holding that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use"); *Fraser*, 478 U.S. at 681 (affirming a school policy against lewd or offensive speech as consonant with the school's duty to "inculcate the habits and manners of civility"). At the hearing, Ms. Niehoff testified that her objection to the students' t-shirts was based on her conviction that permitting electioneering materials in the auditorium where voting was to take place was unfair to those candidates without such resources.

The Court today need not rule on the wisdom of such an approach. Here, however, there was certainly no formal written policy to that effect at the time, and instead the approach of school administrators appears to have been rather ad hoc, to say the least, at least on the evidence presented to date. And, of course, Avery was not a candidate for any office. The danger of such an ad hoc approach is that it may allow for censorship based on the message conveyed – here, support for Avery in her struggle with administrators. *See, e.g.*, *Guiles*, 461 F.3d. 320 (censorship of a t-shirt harshly critical of President Bush); *K.D. v. Fillmore Cent. Sch. Dist.*, No. 05-CV-0336(E), 2005 WL 2175166 (W.D.N.Y. Sept. 6, 2005) (censorship of a t-shirt bearing anti-abortion message).

Therefore, it is fair to say that the Court is troubled by the school's conduct regarding the "Team Avery" t-shirts. However, as noted previously, the concerns about the "Team Avery" t-shirts are inextricably entwined with Avery's request for a new election, as the Court has not been made aware of any imminent or upcoming election at LMHS and school administrators had no objection

to students wearing such t-shirts outside of the election assembly. Since the Court will not grant Plaintiff's request for a new election and Plaintiff has not identified any upcoming election assembly at which t-shirts might be banned, the Court sees no need to rule definitively on this important issue at this time. *See Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (plaintiff must demonstrate irreparable harm that is "actual *and imminent*") (emphasis added); *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (denying preliminary injunction as premature). Instead, the Court will allow the parties to develop the record further. If the Court is incorrect and there is an imminent election assembly at LMHS at which the wearing of electioneering t-shirts could become an issue, plaintiff is free to renew her request for a preliminary injunction and the Court is prepared to act expeditiously.

## IV.  Equal Protection Claims

Avery also claims that her equal protection rights were violated when she was the "only student taken into Defendant Niehoff's office and scolded for the April 24, 2007 e-mail," and when "she was punished for her livejournal.com entry while another student who posted another comment on livejournal.com that stated the superintendent of school was 'a dirty whore' was not punished." Pl.'s Proposed Findings of Fact and Conclusions of Law [doc. # 21], at 10-11. Because Avery does not claim that she was singled out because of her membership in a protected class, her equal protection claim is governed by *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Under *Olech*, a plaintiff essentially claims that she was irrationally treated differently from other people who are similarly situated. Importantly, for a plaintiff to demonstrate that he or she was treated differently from similarly situated individuals in an irrational manner, in violation of the Fourteenth

Amendment, the plaintiff must demonstrate that she is "prima facie identical" to the comparators. *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005). Furthermore, a plaintiff must show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing *Neilson*, 409 F.3d at 105); *see also RJB Props., Inc. v. Bd. of Educ. of Chicago*, 468 F.3d 1005, 1010 (7th Cir. 2006) ("The plaintiff's evidence must be such that it allows a reasonable jury to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.") (quotation marks omitted); *Blackhawk Sec., Inc. v. Town of Hamden*, No. 3:03CV2101 (MRK), 2005 WL 1719918, at \*3-\*4 (D. Conn. July 22, 2005) (discussing the high standard of similarity required for *Olech* claims).

Having examined the evidence provided by Avery, the Court finds that she has failed to show a clear or substantial likelihood of success on the merits of her equal protection claim. Regarding the April 24, 2007 email, Ms. Niehoff testified that she had similar log entries placed in the activity logs of each of the four students involved in sending the original Jamfest email. J.E., one of the Jamfest coordinators and a co-signatory of the email, testified that she and her mother in fact found a similar entry in her own log.[13] All four students were present at the April 25, 2007 meeting with

---

[13] P.A. did not testify regarding the presence or absence of such an entry in his log. T.F. testified at his deposition that his parents received a call from Ms. Doninger, suggesting they check his guidance file. When his parents called the guidance office, however, they were told that no such entry existed in T.F.'s guidance file. Dep. of T.F., Ct. Ex. 1, at 55. The Court would note, however, that the absence of an entry from T.F.'s *guidance file* has no bearing on whether or not such an entry existed in his *activity log*.

Ms. Niehoff and Ms. Schwartz, at which Ms. Niehoff testified she raised the issues of the impropriety of the email and the conduct expected of class officers. Even crediting Avery's account that Ms. Niehoff did not discuss the conduct expected of class officers, all the students present were aware that Ms. Niehoff and Ms. Schwartz were upset about the email and the resulting phone calls and emails from parents and local citizens. Thus, the Court finds that Avery was not the only student scolded for sending the original Jamfest email on April 24, 2007.

Avery also claims that her rights to equal protection were violated when she was punished for her livejournal.com blog entry, while another student who had written on that same website that Ms. Schwartz was a "dirty whore" was not, and when she was "singled out arbitrarily [and] punished" with removal from the running for Senior Class Secretary. With respect to the former, Ms. Niehoff testified that the other student had been dealt with, but that she could not discuss the details, which were private and protected by federal privacy law. *See* Family Educational and Privacy Rights Act, 20 U.S.C. § 1232g. More importantly, however, Avery has failed to identify a single prima facie identical comparator who was not similarly punished. The other students involved in sending the original Jamfest email did not write blog entries including vulgar and arguably inaccurate information; nor did they encourage people to contact the central office "to piss [administrators] off more." Defs.' Ex. C. The student who wrote the additional comment about Ms. Schwartz engaged in equally vulgar and offensive speech, but she was not running for class officer, and so is not in a prima facie identical position to Avery's role as a student leader. In light of all these differences, the Court finds that Avery was not singled out for punishment among the students who disagreed with the administration's decision; rather, she was punished not for her disagreement but for the manner in which she, and she alone, chose to express that disagreement. Thus, Avery has

33

failed to make a clear or substantial showing of likelihood of success regarding her *Olech* equal protection claims. Of course, that ruling does not preclude Avery from making such a showing upon a full record following discovery.

### V. Conclusion

For the reasons stated above, Plaintiff's Application for Temporary Injunction and Order to Show Cause [doc. # 9] is hereby DENIED. The parties shall file a Rule 26(f) report setting forth a proposed schedule for the case **on or before September 17, 2007**.

IT IS SO ORDERED.


   /s/ Mark R. Kravitz
United States District Judge


**Dated at New Haven, Connecticut: August 31, 2007.**