# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

AVERY DONINGER,             :
                                   :
               Plaintiff,      :
                                   :
v.                             :      NO. 3:07CV1129 (MRK)
                                   :
KARISSA NIEHOFF and    :
PAULA SCHWARTZ,        :
                                   :
               Defendants.   :

## MEMORANDUM OF DECISION

In *Doninger v. Niehoff*, 514 F. Supp. 2d 199, 203 (D. Conn. 2007), this Court denied Plaintiff's Motion for a Preliminary Injunction on the ground that she had not shown a substantial likelihood of succeeding on her claim that Defendants' actions while she was a student at the Lewis S. Mills High School violated her constitutional rights. Plaintiff appealed the Court's injunction ruling, and shortly before Avery Doninger's graduation, the Second Circuit affirmed in *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008). Though her request for an injunction is now mooted by her graduation, Ms. Doninger continues to press her lawsuit for damages against school officials.[1] After the close of discovery, all parties filed cross-motions for summary judgment. For the reasons that follow, Defendants' Motion for Summary Judgment [doc. # 73] is GRANTED in part and DENIED in part, and Plaintiff's Motion for Partial Summary Judgment [doc. # 74] is DENIED.

## I.

The facts of this case are familiar to all involved, and were set forth at length in the Court's preliminary injunction ruling. *See Doninger*, 514 F. Supp. 2d at 203. The Court assumes familiarity

---

[1] Because Avery Doninger was a minor when this lawsuit began, the Plaintiff was initially her mother, Lauren Doninger, as guardian and next friend of Avery Doninger. Once Avery turned eighteen, she was substituted as Plaintiff for Lauren Doninger. *See* Order [doc. # 85].

with the facts recited in that opinion.  In brief, Avery Doninger, a former student at the Lewis S. Mills High School in Burlington, Connecticut ("LMHS"), challenges several actions by Karissa Niehoff, principal of LMHS, and Paula Schwartz, the superintendent of Region 10 School District. First, Ms. Doninger claims that Ms. Niehoff and Ms. Schwartz violated her First Amendment rights by disqualifying her from running for senior class secretary as punishment for a blog entry that Ms. Doninger posted on livejournal.com.  Second, she asserts that Defendants violated her First Amendment rights by prohibiting students from wearing "Team Avery" t-shirts into the school auditorium while students were delivering speeches in connection with the election of class officers. Third, she contends that Defendants violated her Fourteenth Amendment rights by treating her differently from other similarly-situated students when they punished her for the blog entry and allegedly placed a disciplinary log in Ms. Doninger's permanent file.  In addition to claiming that these actions violated her federal constitutional rights, Ms. Doninger also alleges that the same conduct by Defendants violated the Connecticut Constitution.  Finally, she brings a claim for intentional infliction of emotional distress.

## II.

Before turning to the motions currently pending before the Court, a brief review of the prior decisions in this case is in order. This lawsuit was originally removed from state court in July of 2007, shortly after Ms. Doninger completed her junior year at LMHS.  Claiming irreparable harm if she was not given an opportunity to run for senior class secretary, Ms. Doninger sought a preliminary injunction on the basis of her First and Fourteenth Amendment claims.  After holding four days of hearings, during which the Court heard testimony from ten witnesses and received into evidence numerous exhibits, the Court denied the Motion for a Preliminary Injunction, finding that

Ms. Doninger had not established a substantial likelihood of success on the merits. *Doninger*, 514 F. Supp. 2d at 218, 220.

### A.

On Ms. Doninger's claim that disqualifying her from running for class secretary violated her First Amendment rights, after reviewing the Supreme Court's decisions concerning student speech in public schools, the Court initially observed that it was not clear whether the *Tinker* or *Fraser* line of cases applied to the particular facts at issue. In brief, in *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969), the Supreme Court held that "conduct by the student, in class or out of it, which for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantees of freedom of speech." *Id.* at 513. In *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), the Supreme Court held that "[t]he First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech . . . would undermine the school's basic educational mission." *Id.* at 685.

The Court believed that this case differed from both *Tinker* and *Fraser* because it did not arise from a suspension or other similar student discipline but rather involved participation in voluntary, extracurricular activities – namely, serving as class secretary. In other contexts, the Court explained, "the Supreme Court and other courts have been willing to accord great discretion to school officials in deciding whether students are eligible to participate in extracurricular activities." *Doninger*, 514 F. Supp. 2d at 213. The Court cited one treatise as noting that "an overwhelming majority of both federal and state courts have held that participation in extracurricular activities . . . is a privilege, not a right." *Id.* For example, in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007),

the Sixth Circuit held that it did not violate the First Amendment to bar students from participation on the football team because they had signed a petition seeking removal of the coach.  The *Lowery* court reasoned that "Plaintiffs' regular education has not been impeded, and significantly, they are free to continue their campaign to have Euverard fired.  What they are not free to do is continue to play football for him while actively working to undermine his authority."  *Id.* at 600.

Similarly, this Court explained that Ms. Doninger's education was not impeded by Defendants' actions and she remained "free to express her opinions about the school administration and their decisions in any manner she wishes . . . .  However, Avery does not have a First Amendment right to run for a voluntary extracurricular position as a student leader while engaging in uncivil and offensive communications regarding school administrators."  *Doninger*, 514 F. Supp. 2d at 216.  In this case, even Ms. Doninger's mother conceded that Ms. Doninger should be punished for what her mother acknowledged was an offensive blog entry;  Ms. Doninger's mother simply felt that barring her daughter from running for class secretary was a punishment that "did not fit the crime."  *Id.* at 202.  Without deciding what was the most "fitting" punishment for Ms. Doninger's conduct, the Court was willing to defer to the experience and expertise of school officials, though the Court hastened to add that "[n]one of this is to say that school officials have completely unfettered discretion to disqualify students from participating in extracurricular activities. [However,] [t]his Court is not faced with a case where a student was denied the right to run for student office because of the color of her skin, or her religion or even her politics."  *Id.* at 215.

> Nor was Avery barred from running simply because she disagreed with school administrators and that is made clear by the fact that the other three students who sent the mass Jamfest email were permitted to run for student office.  Instead, Avery was barred from running as a class officer because of her conduct and the vulgar language she used in her blog, neither of which were consistent with her desired role as a class leader.

*Id.*

In the alternative, the Court concluded that if it had to choose between the *Tinker* and *Fraser* line of cases, the Court considered the facts of the case "closer to *Fraser* than to *Tinker*," though the Court admitted that "this calculus is less than entirely clear and that this case is neither just like *Fraser* nor *Tinker*."  *Id.* at 216.  The Court noted that the Second Circuit had recently decided *Wisniewski v. Board of Education of the Weedsport Central School District*, 494 F.3d 34 (2d Cir. 2007).  In that case, the Second Circuit extended *Tinker* to cover off-campus speech "that poses a reasonably foreseeable risk [of coming] to the attention of school authorities . . . ."  *Id.* at 38.  This Court reasoned that although *Wisniewski* concerned speech analyzed under the *Tinker* framework, its reasoning should be extended to include off-campus speech that would otherwise be analyzed under *Fraser.  See Doninger*, 514 F. Supp. 2d at 216.  In other words, school administrators could punish off-campus speech that is offensive or vulgar by disqualifying a student from running for student office, so long as the speech, as here, posed a reasonably foreseeable risk of coming on to school property.  The Court explained, however, that it would be reluctant to conclude that no First Amendment violation had occurred "in other factual contexts or if the discipline imposed on Avery were different."  *Doninger*, 514 F. Supp. 2d at 217.

The Court expressed "more substantial concerns . . . regarding the 'Team Avery' t-shirts," but decided that because there was no imminent election assembly, a preliminary injunction was not necessary.  *See id* at 218.  Finally, the Court concluded that Ms. Doninger had failed to show a clear or substantial likelihood of success on the merits on her Equal Protection claim, which was based on a "class-of-one" theory, because she had failed to show that she was *prima facie* identical to others who were treated differently.  *See Doninger*, 514 F. Supp. 2d at 220.

**B.**

The Second Circuit affirmed this Court's First Amendment ruling, although it did so on different grounds than those relied on by this Court.  The court agreed that "Avery's language, had it occurred in the classroom, would have fallen within *Fraser* and its recognition that nothing in the First Amendment prohibits school officials from discouraging inappropriate language in the school environment." *Doninger*, 527 F.3d at 49.  However, the Second Circuit explained that "[i]t is not clear [whether] *Fraser* applies to off-campus speech," a question that the court noted the Supreme Court had not yet addressed.  *Id*. at 48-49.  The Second Circuit explicitly did not resolve this question because it concluded that, " as in *Wisniewski*, the *Tinker* standard has been adequately established here." *Id.* at 50 ("We therefore need not decide whether other standards may apply when considering the extent to which a school may discipline off-campus speech.").

The Second Circuit relied on three factors to support its conclusion that Ms. Doninger's blog entry satisfied the *Tinker* standard – that is, that her speech "foreseeably created a risk of substantial disruption within the school environment." *Id.* (citation, quotation marks, and brackets omitted).[2]  First, the court looked at the language that Ms. Doninger had used in her blog entry and found it to be "plainly offensive" and "potentially disruptive of efforts to resolve the ongoing controversy" over Jamfest. *Id.*; *see also id.* at 51 (referring to the "post's vulgar and, in this circumstance, potentially incendiary language").

Second, the Second Circuit observed that the blog entry was "at best misleading and at worst

_____

[2] As a preliminary matter, the Second Circuit concluded that the record amply supported this Court's conclusion that Ms. Doninger's blog posting was purposefully designed to come on to the LMHS campus, and that it was reasonably foreseeable that other students would view the blog and that school administrators would become aware of it.  *See Doninger*, 527 F.3d at 50.

false." *Id.* at 51 (quoting *Doninger*, 514 F. Supp. 2d at 202 (brackets omitted)).  According to the court, Ms. Doninger's "misleading information was disseminated amidst circulating rumors of Jamfest's cancellation that had already begun to disrupt school activities. . . . It was foreseeable in this context that school operations might well be disrupted further by the need to correct misinformation as a consequence of Avery's post." *Id.*  The Second Circuit noted that a showing of actual disruption is not required by *Tinker*;  rather the question is whether school officials "might reasonably portend disruption from the student expression at issue." *Id.* (quotation marks and citation omitted).

Third, the court explained that "it is of no small significance that the discipline here related to Avery's extracurricular role as a student government leader" because  "Avery's conduct risked not only disruption of efforts to settle the Jamfest dispute, but also frustration of the proper operation of LMHS's student government and undermining of the values that student government, as an extracurricular activity, is designed to promote." *Id.* at 52.  Viewed in this light, the Second Circuit observed, this case bore a similarity to the *Lowery* decision relied on by this Court.  As in *Lowery*, there was no First Amendment violation in disqualifying Ms. Doninger from running for class secretary in view of her offensive blog posting.

The Second Circuit rejected Ms. Doninger's Equal Protection claim for much the same reasons as this Court.  The court further rejected Ms. Doninger's claims under the Connecticut Constitution, finding that although Ms. Doninger "argues that the Connecticut Constitution affords broader protections than those of the First Amendment . . . she can cite no Connecticut cases that expressly find broader speech rights for students than are available under the federal constitution." *Id.* at 53 (quotation marks and citations omitted).  Thus, the Second Circuit concluded that Ms.

Doninger had failed to show a substantial likelihood of success on the merits for any of her claims.

### III.

Defendants argue that they are entitled to summary judgment on the basis of the Second Circuit's decision and the record created at the preliminary injunction hearing. Ms. Doninger responds that, despite the Second Circuit's adverse decision, she is entitled to a trial on her First Amendment claim regarding her blog entry because new evidence obtained during discovery casts doubt on two of the three factors relied on by the Second Circuit and also because there is conflicting evidence in the record as to whether Ms. Niehoff punished her because of the potential for disruption or because she found the blog entry offensive.

### A.

First, Ms. Doninger points to new evidence in the record that she alleges calls into question the conclusion that the blog entry was "at best misleading and at worst false" as found by both this Court and the Second Circuit. For instance, Ms. Niehoff says in a newly-discovered email that "I will tell Jen Hill that the event runs in the cafeteria, acoustic only, or that it is cancelled," Pl.'s Obj. to Mot. for Summ. J. [doc. # 82] Ex. 4, which is consistent with Ms. Doninger's testimony at the preliminary injunction hearing, *see* Defs.' Mot. for Summ. J. [doc. # 73] Ex. A at 261. In another email to Ms. Schwartz and David Miller, Ms. Niehoff says that she has "no problem being the bad guy, so to speak by directing them to use the cafeteria again this year - acoustic only." Pl.'s Obj. to Mot. for Summ. J. [doc. # 82] Ex. 11. Ms. Niehoff, on the other hand, testified that she never said it was cancelled and that she merely said that it would have to be held on the scheduled date in the cafeteria or at some later date in the auditorium. Other evidence in the record supports Ms. Niehoff's testimony. Thus, Ms. Doninger contends that there is a factual dispute on the issue of whether she

was told Jamfest was cancelled and, hence, whether her blog entry was false.

Ms. Doninger also claims that new evidence casts doubt on whether the blog entry actually caused disruption as Defendants alleged. For instance, Ms. Doninger points to an email sent by Ms. Niehoff in which she says she does not care that she must miss a health seminar in order to deal with the fallout from the blog entry. *See* Pl.'s Obj. to Mot. for Summ. J. [doc. # 82] Ex. 5. From this, Ms. Doninger argues that Ms. Niehoff chose not to attend the seminar because she did not want to go and not because of any disruption caused by the blog entry. In another example, Defendants argued at the preliminary injunction hearing that they were required to provide alternate coverage for Jennifer Hill's class so that she could attend the meeting about Jamfest. According to Ms. Doninger, Ms. Neihoff's email shows that it was Ms. Niehoff's choice to have the meeting at that time and that she was not forced to find coverage for Ms. Hill's class. *See id.*

It is true that while the Court was entitled to discredit Ms. Doninger's testimony at the preliminary injunction stage, the Court may not decide credibility issues on a motion for summary judgment. *See Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."). However, even taking the foregoing evidence in the light most favorable to Ms. Doninger, the Court is unconvinced that this new evidence, without more, creates a genuine issue of material fact. Although there may be a factual dispute about whether the blog entry was false, there is no doubt that it was misleading. None of Ms. Doninger's evidence suggests that Jamfest was ever cancelled entirely, as implied in the blog entry. At most, there is conflicting evidence about whether the students were given the option of rescheduling Jamfest in the auditorium at a later date.

Furthermore, the fact that Ms. Niehoff apparently did not care whether she missed her health seminar does not mean that there was no disruption. Ms. Niehoff may have prioritized the meeting about Jamfest over the health seminar precisely because it had caused so much disruption. Likewise, she may have chosen to pull Jennifer Hill out of class because the situation needed to be resolved quickly. The fact that Ms. Niehoff chose to have the meeting at that time does not negate the fact that Ms. Hill's teaching schedule was disrupted. Quibbling about who scheduled a meeting does not help Ms. Doninger survive summary judgment. And Ms. Doninger has failed to uncover evidence that shows that the numerous other examples of disruption given by Defendants were somehow fabricated or untrue. More importantly, as the Second Circuit noted, even if Defendants had failed to show any actual disruption, "[t]he question is not whether there has been *actual disruption*, but whether school officials 'might reasonably portend disruption' from the student expression at issue." *Doninger*, 527 F.3d at 51 (emphasis added).

Nevertheless, Ms. Doninger's other objection to summary judgment on the basis of the Second Circuit's decision is more substantial. She argues that even if her blog entry did raise the potential for disruption at LMHS, Ms. Niehoff and Ms. Schwartz did not punish her for that reason. Rather, Ms. Doninger argues, they were offended by the language she used in blog entry, particularly the word "douchebag," and therefore they punished Ms. Doninger for her speech, not for the potential for disruption. The potential for disruption, Ms. Doninger alleges, was concocted after the fact in order to justify Defendants' actions. Ms. Doninger is correct that *Tinker* requires not only a potential for disruption, but also that "the concern for disruption, rather than some other, impermissible motive, was the actual reason for" the punishment imposed. *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006); *see also Sheppard v. Beerman*, 317 F.3d 351, 356 (2d Cir. 2003).

Thus, in *Tinker*, the Supreme Court noted that the "testimony of school authorities at trial indicates that it was not fear of disruption that motivated the regulation prohibiting the armbands; the regulation was directed against 'the principle of the demonstration' itself." *Tinker*, 393 U.S. at 509 n.3.

The Court agrees with Ms. Doninger that there is evidence in the record – particularly when viewed in the light most favorable to her – that suggests that Ms. Niehoff may have punished Ms. Doninger because the blog entry was offensive and uncivil and not because of any potential disruption at school.  For example, Ms. Niehoff testified that she punished Ms. Doninger because the blog entry "demonstrate[d] lack of citizenship" and she said that she thought "the word douchebags itself [was] a horrible word."  Defs.' Mot. for Summ. J. [doc. # 73] Ex. J at 560.  This Court accepted these reasons and denied the preliminary injunction on that ground.  *See Doninger*, 514 F. Supp. 2d at 214-15.  To be sure, there is other evidence in the record to suggest that the potential for disruption did motivate Defendants to bar Ms. Doninger from running for class secretary.  Ms. Niehoff in particular testified that she punished Ms. Doninger, in part, because of the disruptive nature of the blog entry.  *See* Defs.' Mot. for Summ. J. [doc. # 73] Ex. J at 561.  And of course, school administrators may have multiple motivations for their actions.  It is possible that Ms. Niehoff was motivated both by the potential for disruption and by the offensive nature of the blog entry.

However, Defendants did not even discover the blog entry until weeks after the Jamfest incident had been resolved, at which point there was no longer any potential for disruption. The Court does not suggest that a school cannot punish potentially disruptive behavior after the fact so as to prevent students from engaging in the same disruptive behavior in the future.  *See Doninger*,

-11-

527 F.3d at 52 ("This 'reasonable forecast' test applies both to instances of prior restraint, where school authorities prohibit or limit expression before publication, and to cases like this one, where Avery's disqualification from student office followed as a consequence of the post she had already made available to other students."). However, the timing of Ms. Doninger's punishment in this case, together with Ms. Niehoff's testimony, creates a disputed issue of material fact as to Defendants' true motivation for punishing Ms. Doninger. That dispute of fact prevents the Court from granting Defendants summary judgment on the basis of the Second Circuit's decision alone.

## B.

That does not end the inquiry, however. For Defendants also claim they are entitled to qualified immunity even on Ms. Doninger's version of the facts. Qualified immunity shields public officials from lawsuits for damages, unless their actions violate clearly established rights of which an objectively reasonable official would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It is an "immunity from suit rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*; *see also Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). As a result, the Supreme Court and the Second Circuit "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see also Saucier v. Katz*, 533 U.S. 194, 200 (2001).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set forth the relevant inquiries when a defense of qualified immunity is raised. Under *Saucier*, the Court must first decide

whether, taking the facts in the light most favorable to the plaintiff, a constitutional violation

occurred.  If so, the Court must then decide whether the right was clearly established.  *See Saucier*,

533 U.S. at 201;  *see also Gilles*, 511 F.3d at 243.  "The contours of the right must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right."  *Saucier*,

533 U.S. at 202.  That is, the "relevant, dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted."  *Id.*  As the Supreme Court explained:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can
> be made as to the legal constraints on particular [official] conduct.  It is sometimes
> difficult for an [official] to determine how the relevant legal doctrine . . . will apply
> to the factual situation the [official] confronts.  An [official] might correctly perceive
> all of the relevant facts but have a mistaken understanding as to whether a particular
> [act] is legal in those circumstances.  If the [official's] mistake as to what the law
> requires is reasonable, however, the [official] is entitled to the immunity defense.

*Id.* at 205.

Though the Supreme Court recently took up the issue of whether *Saucier* should be

overruled, *see Pearson v. Callahan*, 128 S. Ct. 1702 (2008) (granting certiorari), the Supreme Court

has not yet issued a decision in the case.  Thus, unless and until the Supreme Court overrules

*Saucier*, this Court must continue to employ the mandatory two-step process for deciding qualified

immunity claims.[3]

The Court is convinced that Defendants are entitled to summary judgment on their defense

of qualified immunity insofar as Ms. Doninger's First Amendment blog entry claim is concerned.

---

[3] The Court is cognizant of the fact that in certain situations the Second Circuit has departed from *Saucier*'s rigid two-step process.  *See Higazy v. Templeton*, 505 F.3d 161, 179 n.19 (2d Cir. 2007) ("We do not reach the issue of whether [plaintiff's] Sixth Amendment rights were violated because principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of the case.").

Turning to the first step under *Saucier*, this Court has already held that under *Fraser*, there was no First Amendment violation, even if Ms. Doninger was punished because of the offensive content of her blog entry rather than for its potential for disruption. *See Doninger*, 514 F. Supp. 2d at 216. The Second Circuit also acknowledged that if *Fraser* applied to off-campus speech, there was no question that *Fraser* permitted school officials to bar Ms. Doninger from running for class secretary. Indeed, Ms. Doninger's counsel conceded at oral argument on the summary judgment motions, that if, as the Court previously held, *Fraser* applied to off-campus speech, Ms. Doninger's First Amendment rights were not violated. It is true that the Second Circuit declined to decide whether *Fraser* applied to off-campus speech in the context of an extracurricular activity. But given that this Court has already decided this issue, unless and until the Second Circuit rules otherwise, the Court does not believe there is any reason to change its position that Ms. Doninger's First Amendment rights were not violated when she was told that she could not run for class secretary because of an offensive blog entry that was clearly designed to come on to campus and influence fellow students.

To be sure, the fact that the Second Circuit declined to address *Fraser* in its decision might have been intended to gently telegraph to the Court that it erred in its analysis of *Fraser*. However, even if *Fraser* does not apply to off-campus speech, the Court believes that Defendants would still enjoy qualified immunity because the constitutional right at stake was not clearly established at the time the alleged violation occurred.

In order to make this determination, the Court must first carefully define the constitutional right at issue. In *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000), the Second Circuit cautioned courts "to consider carefully the level of generality at which the relevant 'legal rule' is to be identified." *Id.* at 348 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). On one hand, "[i]f the right

-14-

is identified at a high level of generality," such as the right to freedom of speech, "the concept of qualified immunity would become meaningless because every government officer is reasonably aware of a right defined that broadly." *Id.* at 348-49. On the other hand, a right defined with too much particularly, such as the right not to be prohibited from running for class secretary because of an offensive blog posting, runs the risk that "qualified immunity would be a defense 'unless the very action in question has previously been held unlawful.'" *Id.* at 349 (quoting *Anderson*, 635 U.S. at 640). The Court here, as in *Zahrey*, strikes a middle ground, and defines the right at issue as the right not to be prohibited from participating in a voluntary, extracurricular activity because of offensive off-campus speech when it was reasonably foreseeable that the speech would come on to campus and thus come to the attention of school authorities.

With the right so defined, the Court concludes that it was not clearly established. First, as the Court previously has stated, it is not at all clear that participation in extracurricular activities should be considered a right at all. Although the Supreme Court has addressed this question in other contexts, *see, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995), it has not addressed it in the context of the First Amendment. Neither had the Second Circuit addressed it at the time the events in question occurred. Of course, one could argue that it is now clearly established that participation in an extracurricular activity is *not* a right, given the Sixth Circuit's decision in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007), decided in August 2007, and the Second Circuit's decision in this case, which cited *Lowery* approvingly and which concluded that "it is of no small significance that the discipline here related to Avery's extracurricular role as a student government leader." *Doninger*, 527 F.3d at 52. Given that these more recent opinions suggest that participation in extracurricular activities is not a right, it cannot be the case that exactly the opposite was clearly

-15-

established at the time Defendants prohibited Ms. Doninger from running for class secretary, especially since neither the Sixth Circuit in *Lowery* nor the Second Circuit in this case framed their opinions as effectuating a change in the existing law.

Second, it is hardly debatable that *Fraser*'s applicability to off-campus speech was not clearly established when Defendants made the decision to punish Ms. Doninger. Indeed, it is not even clearly established today given the fact that the Second Circuit explicitly refused to decide the issue in this very case. At the time of the events in question, it was not even clearly established that *Tinker* applied to off-campus speech because *Wisniewski* was not decided until July 2007, several months after Ms. Niehoff prohibited Ms. Doninger from running for class secretary.

Ms. Doninger points to *Thomas v. Board of Education*, 607 F.2d 1043 (2d Cir. 1979) for the proposition that it was well established "that the arm of [school] authority does not reach beyond the schoolhouse gate." *Id.* at 1044-45. But the majority in *Thomas* also noted that there may be cases in which school officials can regulate off-campus speech. *See id.* at 1052 n.17. Furthermore, Judge Newman opined in his concurrence that "[s]chool authorities ought to be accorded some latitude to regulate student activity that affects matter of legitimate concern to the school community, and territoriality is not necessarily a useful concept in determining the limit of their authority." *Id.* at 1058 n.13. Ms. Doninger's argument that *Thomas* clearly established that schools were generally prohibited from regulating off-campus speech is further undercut by the fact that the Second Circuit, citing *Thomas*, held otherwise just a few months after the events in question. *See Wisniewski*, 494 F.3d at 38. Other courts outside the Second Circuit had split on the question of whether schools could punish off-campus speech at the time of the relevant events. *Compare Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446, 454 (W.D. Pa. 2001), *and Beussink v. Woodland*

*R-IV Sch. Dist.*, 30 F. Supp. 2d 1175 (E.D. Mo. 1998), *with J.S. v. Bethlehem Area Sch. Dist.*, 757 A.2d 412, 415 (Pa. Commw. Ct. 2000), *and Boucher v. School Bd.*, 134 F.3d 821, 827 (7th Cir. 1998).

Perhaps more importantly, we are not living in the same world that existed in 1979. The students in *Thomas* were writing articles for an obscene publication on a typewriter and handing out copies after school. Today, students are connected to each other through email, instant messaging, blogs, social networking sites, and text messages. An email can be sent to dozens or hundreds of other students by hitting "send." A blog entry posted on a site such as livejournal.com can be instantaneously viewed by students, teachers, and administrators alike. Off-campus speech can become on-campus speech with the click of a mouse. As the case before us demonstrates, we are decidedly not in the world confronted by the Second Circuit in *Thomas*. In the words of one court:

> the line between on-campus and off-campus speech is blurred with increased use of the internet and the ability of students to access the internet at school, on their own personal computers, school computers and even cellular telephones. As technology allows such access, it requires school administrators to be more concerned about speech created off campus – which almost inevitably leaks onto campus – than they would have been in years past.

*J.S. v. Blue Mt. Sch. Dist.*, No. 3:07cv585, 2008 WL 4279517, at *7 n.5 (M.D. Pa. Sept. 11, 2008). As one commentator notes, this changing environment has created new challenges for school administrators, who are

> increasingly faced with instances of threatening or derogatory student speech on the Internet. The lack of direction from the Court has resulted in overzealous restriction or excessive protection of student speech by administrators who are unclear as to the amount of and circumstances surrounding First Amendment protection that is accorded to students. Students are increasingly pushing the envelope to the outer bounds of administrators' authority to punish student speech, and new contexts for speech, such as web pages, email, and instant messaging communications, keep emerging. In light of these problems, the three seemingly clear standards of *Tinker*, *Fraser*, and *Hazelwood* have become muddled and are applied to varying degrees by

different courts, leaving behind a state of confusion regarding the proper test to be applied and the proper context in which to apply it.

Erin Reeves, *The Scope of a Student: How to Analyze Student Speech in the Age of the Internet*, 42 Ga. L. Rev. 1127, 1131 (2008).

First Amendment jurisprudence will need to evolve in order to address this new environment, and the Second Circuit has begun to address it in cases such as *Wisniewski* .  But the contours of the law in this area are still unclear, as even a cursory review of the legal commentary shows.  Thus, a recent law review article observes that "when it comes to student cyber-speech, the lower courts are in complete disarray, handing down ad hoc decisions that, even when they reach an instinctively correct conclusion, lack consistent, controlling legal principles."  Kenneth R. Pike, *Locating the Mislaid Gate: Revitalizing* Tinker *by Repairing Judicial Overgeneralizations of Technologically Enabled Student Speech*, 2008 B.Y.U. L. Rev. 971, 990 (2008);  *see also* Kyle W. Brenton, *BONGHiTS4JESUS.COM? Scrutinizing Public School Authority Over Student Cyberspeech Through the Lens of Personal Jurisdiction*, 92 Minn. L. Rev. 1206, 1215 (2008) ("[T]he extent to which [the First Amendment] protects the off-campus online speech of students remains unsettled.");  Robert D. Richard & Clay Calvert, *Columbine Fallout: The Long-Term Effects on Free Expression Take Hold in Public School*s, 83 B.U. L. Rev. 1089, 1140 (2003) ("[T]he judiciary seems to be in a state of tumult about the precise scope of First Amendment rights possessed by students.");  Kara D. Williams, *Public Schools vs. MySpace & Facebook: The Newest Challenge to Student Speech Rights*, 76 U. Cin. L. Rev. 707, 719 (2008) ("The Supreme Court has never addressed student Internet speech specifically, and it is difficult for lower courts to apply the existing framework to the type of cases discussed above.  The Internet has changed the concept of student speech, rendering elements of the existing framework untenable.");  Sandy S. Li, *The Need for a New,*

-18-

*Uniform Standard: The Continued Threat to Internet-Related Student Speech*, 26 Loy. L.A. Ent. L. Rev. 65, 67 (2005) ("Due to these conflicting standards, there is a lack of uniformity amongst the decisions rendered by the lower courts . . . As a result, schools and students have very little guidance when trying to determine what type of speech is protected.");  Brian Oten, *Disorder in the Courts: Public School Student Expression on the Internet,* 2 First Amend. L. Rev. 403, 422 (2004) ("The various and inconsistent outcomes among lower courts in attempting to apply precedent to this emerging area of law necessitate action by higher courts in determining specifically what standards apply to Internet speech.").

If courts and legal scholars cannot discern the contours of First Amendment protections for student internet speech, then it is certainly unreasonable to expect school administrators, such as Defendants, to predict where the line between on- and off-campus speech will be drawn in this new digital era.  Since, as explained above, the particular right Ms. Doninger seeks to enforce was not clearly established at the time of the events in question, Defendants are entitled to qualified immunity on Ms. Doninger's blog entry First Amendment claim.  Accordingly, the Court GRANTS summary judgment to Defendants on that claim.

## IV.

The Court next turns to Ms. Doninger's "Team Avery" t-shirt First Amendment claim, on which both Ms. Doninger and Defendants move for summary judgment.  The Court denied Ms. Doninger a preliminary injunction on this issue because it found that there was no imminent election assembly and, hence, no risk of irreparable harm.  Ms. Doninger has now graduated, and the Court presumes that she will not be attending any election assemblies at LMHS.  Furthermore, the school has apparently implemented new guidelines for election assemblies that would make Ms. Doninger's

claim for injunctive relief moot even if she were still a student at LMHS.  Of course, none of that affects Ms. Doninger's claim for damages.

In its preliminary injunction ruling, the Court made clear that the "Team Avery" t-shirts were "not governed by either *Fraser* or *Kuhlmeier*, but rather by *Tinker*."  *Doninger*, 514 F. Supp. 2d at 218.  The t-shirts did not violate the school's dress code and did not contain vulgar or offensive language.  *See Fraser*, 478 U.S. at 685.  Nor was there any risk that the t-shirts would be mistaken for school-sponsored speech.  *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). The students intended to wear the t-shirts into the auditorium in silent protest, much like the students intended to wear black armbands in *Tinker*, and the Court found nothing to suggest that the t-shirts "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."  *Doninger*, 514 F. Supp. 2d at 218 (quoting *Tinker*, 393 U.S. at 509).  On summary judgment, Defendants have presented no evidence to undermine the Court's conclusion in this regard.

Defendants contend that they were simply enforcing a general ban on electioneering materials and not singling out the "Team Avery" t-shirts because of the message they contained.  As the Court indicated in its preliminary injunction ruling, the Court has no doubt that a school could choose to place reasonable viewpoint-neutral restrictions on electioneering materials in school assemblies.  *See Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005) (holding that public schools are non-public fora in which "reasonable and viewpoint neutral" restrictions are permissible under the First Amendment); *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004) ("The State may reserve [a nonpublic forum] for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to

suppress expression merely because public officials oppose the speaker's view."); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

However, in this case, LMHS had no general ban on electioneering materials. It is undisputed that there was no written policy that would have prohibited the t-shirts and there is no evidence that Ms. Niehoff was confiscating any other electioneering materials at the doors to the school auditorium. Furthermore, the email sent by Ms. Niehoff to Ms. Schwartz and others on the morning of the election assembly makes clear that she was particularly focused on preventing "Team Avery" t-shirts from being worn into the auditorium. Defendants cannot claim that the t-shirts violated an unwritten policy that Ms. Niehoff apparently made up on the spot and then applied only to the "Team Avery" t-shirts. Such a *post hoc* rationalization is not a reasonable viewpoint neutral restriction. *See Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988) (rejecting *post hoc* rationalizations in the licensing context because of the risk of impermissible viewpoint discrimination); *Summum v. Callaghan*, 130 F.3d 906, 920 (10th Cir. 1997) ("[A]n absence of express standards ma[kes] it far too easy for officials to use 'post hoc rationalizations' and 'shifting or illegitimate criteria' to justify their behavior, [making] it difficult for courts to determine whether an official has engaged in viewpoint discrimination."); *East Timor Action Network, Inc. v. City of New York*, 71 F. Supp. 2d 334, 345-46 (S.D.N.Y. 1999) (holding that City cannot claim that an unwritten policy prohibited political signs when the written policy contained no such limitation and other political signs had been approved). In any event, because Ms. Doninger was barred from running for office, the "Team Avery" t-shirts were not electioneering materials and could not have

-21-

been excluded as such even if a general ban on electioneering materials had existed.

Defendants' principal argument on this claim appears to be that Ms. Doninger lacks standing to pursue a First Amendment claim for damages because she did not intend to wear a "Team Avery" t-shirt into the auditorium and, therefore, her speech was not chilled by Ms. Neihoff's conduct. It is true that for Ms. Doninger to show that her speech was chilled, she "must proffer some objective evidence to substantiate [her] claim that the challenged conduct has deterred [her] from engaging in protected activity." *Bordell v. General Electric Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991); *see also Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."). A plaintiff does not have standing based on a subjective chill, *see Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 226 (2d Cir. 2006), nor can a plaintiff bring a claim on the basis of a chill experienced by others. *See Laird v. Tatum*, 408 U.S. 1, 14 n.7 (1972). Defendants point to Ms. Doninger's testimony at the preliminary injunction hearing, during which she stated that "I kept the other ['Team Avery' t-shirt] because I was going to put it on after," Defs.' Mot. for Summ. J. [doc. # 73] Ex. A at 293, which they construe as implying that Ms. Doninger never planned to wear her "Team Avery" t-shirt in the auditorium. They also note that students were permitted to wear the "Team Avery" t-shirts both before and after the assembly and that Ms. Doninger was permitted to wear another t-shirt – which read "R.I.P. Democracy" – into the auditorium for the assembly. Thus, Defendants argue that Ms. Doninger's speech was not chilled as a matter of law.

Defendants make a strong case, but there is other evidence in the record, which when construed favorably for Ms. Doninger, would permit a reasonable jury to conclude that Ms. Doninger's speech was chilled. For one, in her affidavit in support of her motion for summary

judgment, Ms. Doninger states, "I was afraid to put on the 'Team Avery' shirt that I intended to wear in the auditorium." *Id.* Ex. B, ¶ 21.  For another, the word "after" in Ms. Doninger's preliminary injunction testimony, recited above, could mean any number of things.  It could mean after she got to the assembly, after she sat down, or after the assembly was over.  Moreover, Ms. Doninger did not have to wear the t-shirt in order to get across her message.  She could have, for instance, held the t-shirt up during the assembly when several students called out her name.  The one thing that is clear from the record, however, is that when Ms. Doninger saw Ms. Niehoff prohibiting other students from wearing the "Team Avery" t-shirts, she hid her t-shirt in her backpack and she did not take it out until after the assembly.  While there is conflicting evidence in the record, it is at least arguable that Ms. Doninger's speech was chilled and that is all that is necessary to prevent the entry of summary judgment for Defendants.

Defendants also claim qualified immunity on the t-shirt claim, but the Court concludes that this case is sufficiently similar to *Tinker* that the right was clearly established and, thus, Defendants' are not entitled to qualified immunity.  Defendants point out some distinctions, such as the fact that this case involves t-shirts rather than armbands, that *Tinker* did not involve speech in a school auditorium, and that *Tinker* did not involve electioneering materials.  None of these distinctions convinces the Court that the right of students to engage in non-offensive, non-disruptive speech on school property was not clearly established.  To accept Defendants' qualified immunity defense would be to ignore the Second Circuit's instruction to courts not to define the right so narrowly that "qualified immunity would be a defense unless the very action in question has previously been held unlawful." *Zahrey*, 221 F.3d at 349 (quotation marks omitted).

Therefore, the Court DENIES Ms. Doninger's Motion for Partial Summary Judgment and

DENIES Defendants' Motion for Summary Judgment on this claim.  At trial, Ms. Doninger will have

to prove that her speech was chilled and also will have to prove the amount of damages, if any, that

she suffered as a result of any First Amendment violation that is found.

## V.

The Court turns next to Ms. Doninger's Equal Protection arguments.  This claim is premised

on a "class-of-one" theory, which requires that a plaintiff "has been intentionally treated differently

from others similarly situated and that there is no rational basis for the difference in treatment."

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  To prevail on a "class-of-one" claim,

"the level of similarity between plaintiffs and the persons with whom they compare themselves must

be extremely high."  *Neilson v. D.Angelis*, 409 F.3d 100, 104 (2d Cir. 2005);  *see also Dutko v.*

*Lofthouse*, 549 F. Supp. 2d 187, 191 n.2 (D. Conn. 2008);  *Blackhawk Sec., Inc. v. Town of Hamden*,

No. 3:03CV2101(MRK), 2005 WL 1719918, at *3-5 (D. Conn. July 22, 2005).  In essence, a

plaintiff must establish that "they were treated differently than someone who is *prima facie* identical

in all relevant respects."  *Nielson*, 409 F.3d at 104.  Furthermore, a plaintiff must show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from
> those of a comparator to a degree that would justify the differential treatment on the
> basis of a legitimate government policy; and (ii) the similarity in circumstances and
> difference in treatment are sufficient to exclude the possibility that the defendants
> acted on the basis of a mistake.

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing *Neilson*, 409 F.3d at 105).

Ms. Doninger argues that Defendants treated her differently from others similarly situated

in two respects.  First, she contends that Ms. Niehoff caused a discipline log entry to appear in her

permanent file regarding inappropriate use of school computers to send unauthorized e-mails, while

no such discipline log entry appeared in the files of the other three students involved in the e-mail.

Second, Ms. Doninger asserts that Defendants punished her for the livejournal.com blog entry, while another student who posted an offensive comment in response to the blog entry was not punished and, indeed, was given a good citizenship award shortly thereafter.

The Court finds no merit in Ms. Doninger's "class-of-one" claim.  In terms of the discipline log, it is undisputed that all four students received the same log entry.  Ms. Doninger argues that only she had the discipline log placed in her permanent record.  However, the undisputed evidence in the record shows that the discipline log entry was never part of her permanent record.  *See*  Defs.' Mot. for Summ. J. [doc. # 73] Ex. J at 521-22;  *id.* Ex. L at 53, 74;  *id.* Ex. O at 226, 228-29.  A courtesy copy was temporarily placed in Ms. Doninger's guidance file so that her mother could come in to examine the file;  the discipline log entry was removed shortly thereafter.  Although Ms. Doninger asserts that Ms. Niehoff wanted the discipline log to become part of Ms. Doninger's permanent file and that she used her mother's inspection request as an excuse to do so, there is simply no evidence to support Ms. Doninger's conjecture.  As a result, the Court is more than a little perplexed at Ms. Doninger's continued assertion of this unfounded claim.  *See, e.g.*,  Pl.'s Obj. to Mot. for Summ. J. [doc. # 82] Ex. 8 (Email from Ms. Niehoff to Ms. Bilodeau) ("Mrs. Doninger has asked to come in to review Avery's cumulative file.  I am putting the print out of her discipline record in your box.").

Ms. Doninger's alternative "class-of-one" theory similarly fails because she is not *prima facie* identical to J.R., the student who posted an offensive comment to the blog.  For one, J.R. was not a student council officer, and the punishment Ms. Doninger received was limited to barring her from running for class secretary.  For another, J.R.'s comment, while offensive, did not attempt to provoke disruption by providing students with misleading information and telling them to call Ms. Schwartz

-25-

to "piss her off more."  Both differences are rational reasons why Defendants may have chosen to punish Ms. Doninger and not J.R.  Since Ms. Doninger cannot show that she and J.R. were *prima facie* identical, it is irrelevant that they were treated differently, regardless of how Ms. Doninger would like to characterize J.R.'s good citizenship award.[4]  Therefore, the Court GRANTS Defendants summary judgment on Ms. Doninger's Equal Protection claim.

## VI.

Finally, the Court considers Ms. Doninger's state law claims under Article First, §§ 4, 5, and 14 of the Connecticut Constitution and for intentional infliction of emotional distress.  The Court need not spend much time on Ms. Doninger's Connecticut constitutional claims because she devotes very little space – less than two pages – to them in her brief.  Ms. Doninger has not identified a single Connecticut decision that suggests that free speech protections for public school students are broader under the Connecticut Constitution than under the U.S. Constitution.

More importantly, as Defendants point out, it is not entirely clear whether Connecticut law recognizes a direct cause of action for money damages under the Connecticut Constitution.  In *Binette v. Sabo*, 244 Conn. 23 (1998), the Connecticut Supreme Court authorized a damages action for violations of the right against unreasonable searches and seizures and unlawful arrest.  The Connecticut Supreme Court cautioned, however, that "our decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution."  *Id.* at 47;  *see also Kelley Prop. Dev., Inc. v. Lebanon*, 226 Conn. 314, 338-

---

[4]  Insofar as Ms. Doninger is also basing her Equal Protection claim on the fact that she was prohibited from running for senior class secretary while the other three students involved in writing the original e-mail were not prohibited from running, this claim is also without merit.  The other three students did not post the offensive and potentially disruptive livejournal.com blog entry and therefore are not *prima facie* identical.  *See Doninger*, 514 F. Supp. 2d at 220.

  
40 (1993) (finding no private cause of action based on violation of due process clause of state constitution, Article First, § 8). In later cases, lower courts in Connecticut have shown great restraint in creating new causes of action for money damages directly under the Connecticut Constitution. *See, e.g.*, *Bazzano v. City of Hartford*, No. CV 980584611S, 1999 WL 1097174, at *1 (Conn. Super. Ct. Nov. 18, 1999); *Boudreau v. City of Middletown*, No. CV 970083396S, 1998 WL 321858, at *3 (Conn. Super. Ct. June 9, 1998). Moreover, at least one Connecticut lower court has refused to create a cause of action for money damages under Article First, § 4 of the Connecticut Constitution, one of the constitutional provisions invoked by Ms. Doninger. *See McKiernan v. Amento*, No. CV010453718S, 2003 WL 22333200, at *4 (Conn. Super. Ct. Oct. 2, 2003).

If the Court were to decide this claim, it would have to decide not only whether to create a new cause of action that Connecticut courts have not recognized, but also whether to grant greater protections for student speech under the Connecticut Constitution. This is categorically not the role of a federal court. Hence, the Court declines to exercise supplemental jurisdiction over Ms. Doninger's Connecticut constitutional claims. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the claim raises a novel or complex issue of State law."); *O'Connor v. Nevada*, 27 F.3d 357, 363 (9th Cir. 1994) (dismissing a claim that raised an unsettled question of law under Nevada constitution).[5] Ms. Doninger is, of course, free to pursue her claims in state court. However, this Court is not in the

---

[5] Ms. Doninger suggests that this Court should certify the question to the Connecticut Supreme Court. However, as her counsel acknowledged at oral argument, certification would require that the parties agree on the facts. Although the Court has granted summary judgment on Ms. Doninger's blog entry First Amendment claim, there are still numerous factual disputes that would make certification impossible. Therefore, the Court declines to certify the question to the Connecticut Supreme Court.

business of creating new rights or new causes of action under the Connecticut Constitution.  The Court, therefore, *sua sponte* DISMISSES Ms. Doninger's Connecticut constitutional claims (Count Two) because it declines to exercise supplemental jurisdiction over those claims.

Lastly, Ms. Doninger has brought a tort claim for intentional infliction of emotional distress. In order to prove a claim for intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 442-43 (2003).  Ms. Doninger does not identify anything in particular that was "extreme and outrageous" about Defendants' conduct, except to say that Defendants "violated clearly established constitutional rights that are the basis of a functioning democracy."  Pl.'s Obj. to Mot. for Summ. J. [doc. # 82] at 33.  Thus, the Court assumes that Ms. Doninger believes that prohibiting her from running for senior class secretary and from wearing her "Team Avery" t-shirt into the auditorium amounted to intentional infliction of emotional distress.

Under Connecticut law, "[l]iability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society."  *Carrol*, 262 Conn. at 443;  *see also Morrissey v. Yale Univ.*, 268 Conn. 426, 428 (2004).  It requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Carrol*, 262 Conn. at 443. Moreover, and importantly for this case, "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an

-28-

action based upon intentional infliction of emotional distress." *Id.* (citing *Mellaly v. Eastman Kodak Co.*, 597 A.2d 846 (1991)).

Having considered the record evidence in the light most favorable to Ms. Doninger, the Court believes that no reasonable jury could conclude that the actions of Defendants rise to the level of extreme and outrageous conduct under Connecticut tort law.  Ms.  Doninger was surely disappointed that she could not run for senior class secretary, but it was not "extreme and outrageous" to prohibit her from doing so. And while Ms. Doninger may have been upset that Ms. Niehoff prevented other students from wearing "Team Avery" t-shirts, Ms. Niehoff's actions in this regard were not even directed towards Ms. Doninger.  The only interaction Ms. Doninger and Ms. Niehoff had concerning the T-shirts was when Ms. Niehoff examined Ms. Doninger's "R.I.P. Democracy" t-shirt and allowed her to wear it in the auditorium.  While Ms. Doninger's speech may have been chilled for the purposes of her First Amendment claim, Ms. Niehoff's conduct certainly does not meet the standard of extreme and outrageous.  *Cf. Bell v. Bd. of Educ.*, 55 Conn. App. 400, 403 (Conn. App. Ct. 1999) (finding a cause of action for intentional infliction of emotional distress where for two years Defendant teachers had "encouraged, created and tolerated an atmosphere of chaos, disruptiveness and violence at the school so that the children were exposed on a daily basis to so much physical and verbal violence that it became a place of fear").  Therefore, the Court GRANTS Defendants summary judgment on Ms. Doninger's tort claim (Count Three).

## VIII.

In sum, with respect to Defendants' Motion for Summary Judgment [doc. # 73], the Court GRANTS summary judgment to Defendants on Ms. Doninger's blog entry First Amendment claim, her Equal Protection claim, and her claim for intentional infliction of emotional distress.  The Court

DENIES summary judgment to Defendants on Ms. Doninger's First Amendment "Team Avery" t-shirt claim.  The Court declines to exercise supplemental jurisdiction over Ms. Doninger's state constitutional claims and therefore dismisses those claims without prejudice to renewal in state court.  Finally, the Court DENIES Plaintiff's Motion for Partial Summary Judgment [doc. #  74]. The Court will issue a separate trial scheduling order.

IT IS SO ORDERED.

/s/ Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: January 15, 2009.**